1  LEE R. BOGDANOFF (State Bar No. 119542)
   DAVID M. STERN (State Bar No. 67697)
2  MATTHEW C. HEYN (State Bar No. 227474)
   KLEE, TUCHIN, BOGDANOFF & STERN LLP
3  1999 Avenue of the Stars, 39th Floor
   Los Angeles, California 90067-6049
4  Telephone: (310) 407-4000
   Facsimile: (310) 407-9090
5  E-mail: lbogdanoff@ktbslaw.com, dstern@ktbslaw.com, mheyn@ktbslaw.com

6  ANDREW L. SANDLER (Admitted *Pro Hac Vice*)
   BENJAMIN B. KLUBES (Admitted *Pro Hac Vice*)
7  BENJAMIN P. SAUL (Admitted *Pro Hac Vice*)
   BUCKLEYSANDLER LLP
8  1250 24th Street N.W., Suite 700
   Washington, District of Columbia 20037
9  Telephone: (202) 349-8000
   Facsimile: (202) 349-8080
10 E-mail: asandler@buckleysandler.com, bklubes@buckleysandler.com,
             bsaul@buckleysandler.com
11
   Attorneys for Alfred H. Siegel, Solely as Chapter 7 Trustee
12
                    UNITED STATES BANKRUPTCY COURT
13
                     CENTRAL DISTRICT OF CALIFORNIA
14
                         LOS ANGELES DIVISION
15

16 In re                              | Case No. 2:08-bk-21752-BB

17 INDYMAC BANCORP, INC.,             | Chapter 7

18          Debtor.                   |
   _____    | Adversary Proc. No. 2:09-ap-2645-BB
19 ALFRED H. SIEGEL, solely as Chapter 7 | **PLAINTIFF'S NOTICE OF
   Trustee of the estate of IndyMac Bancorp, | MOTION AND MOTION FOR
20 Inc.,                             | SUMMARY JUDGMENT ON
                                      | PLAINTIFF'S FIFTH CLAIM FOR
21          Plaintiff,               | RELIEF, OR, IN THE
          v.                          | ALTERNATIVE, FOR AN ORDER
22                                    | THAT CERTAIN MATERIAL
                                      | FACTS ARE NOT GENUINELY IN
23 FEDERAL DEPOSIT INSURANCE         | DISPUTE; MEMORANDUM OF
   CORPORATION, in its capacity as Receiver | POINTS AND AUTHORITIES**
24 of IndyMac Bank, F.S.B. and as Conservator |
   of IndyMac Federal Bank, F.S.B.,   |
25                                    | **Hearing**
          Defendant.                 |
26                                    | Date:  May 31, 2011
                                      | Time:  2:00 p.m.
27                                    | Place: Courtroom 1475
                                      |        255 East Temple Street
28                                    |        Los Angeles, CA 90012

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................. 3

II.   STATEMENT OF UNDISPUTED FACTS ......................................... 4

III.  JURISDICTION AND VENUE ......................................................... 7

IV.   ARGUMENT ..................................................................................... 8

    A.    Standard for summary judgment. ............................................. 8

    B.    The Tax Refunds are property of the Bancorp estate. ................ 8

        1.    The TSA establishes a debtor-creditor relationship; thus the Tax Refunds are property of the estate. ............................................ 8

        2.    The overwhelming weight of precedent compels the conclusion that the TSA establishes a debtor-creditor relationship. .............................. 12

        3.    The TSA does not establish an agency relationship with respect to tax refunds. ...................................................................... 16

    C.    The Bob Richards rule is inapt when a tax sharing agreement governs the relationship between the parent and subsidiary, should not apply when the parent company is insolvent, and is outdated in any event. ........................... 19

    D.    The tax allocation agreements that were at issue in the only two decisions ever finding in favor of the FDIC are materially different from the TSA. ...... 22

    E.    Statutes and regulations are silent as to ownership of tax refunds and do not mandate a trust or agency relationship. ..................................... 23

        1.    Treasury Regulations are irrelevant to ownership of the Tax Refunds. .............................................................. 23

        2.    The Interagency Policy Statement is without force, inapt, and, in any event, ambiguous as to ownership of the Tax Refunds. ................ 24

    F.    The FDIC's purported repudiation is irrelevant to ownership of the Tax Refunds. .............................................................. 27

        1.    The FDIC's purported repudiation violated the automatic stay. .......... 28

        2.    The TSA governs this dispute even if repudiation was effective. ........ 29

    G.    The Tax Refunds are property of the estate even though the TSA was deemed rejected. ............................................................ 30

V.    CONCLUSION ................................................................................. 32

- i -

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

ALLTEL Info. Servs., Inc. v. FDIC,
  194 F.3d 1036 (9th Cir. 1999) ...........................................................................29

Altura P'ship v. Breninc, Inc. (In re B.I. Fin. Servs. Grp., Inc.),
  854 F.2d 351 (9th Cir. 1988) .............................................................................14

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) .............................................................................................8

Atherton v. FDIC,
  519 U.S. 213 (1997) ...........................................................................................21

Brandt v. Fleet Capital Corp. (In re TMCI Elecs.),
  279 B.R. 552 (Bankr. N.D. Cal. 1999) ..............................................................19

Bonded Fin. Servs. v. Euro. Am. Bank,
  838 F.2d 890 (7th Cir.1988) ..............................................................................17

BSD Bancorp, Inc. v. FDIC (In re BSD Bancorp, Inc.),
  No. 93-12207-A11 (S.D. Cal. Feb. 28, 1995) ..............................................21, 22

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) .............................................................................................8

Computer Commc'ns, Inc. v. Codex Corp. (In re Computer Commc'ns, Inc.),
  824 F.2d 725 (9th Cir. 1987) .............................................................................28

Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.),
  159 B.R. 9 (Bankr. D. Kan. 1993) .......................................................................9

Foothill Capital Corp. v. Clare's Food Market, Inc.
(In re Coupon Clearing Serv., Inc.),
  113 F.3d 1091 (9th Cir. 1997) ................................................................14-16, 22

Howell v. FDIC,
  986 F.2d 569 (1st Cir. 1993) .............................................................................29

In re Black & Geddes, Inc.,
  35 B.R. 830 (Bankr. S.D.N.Y. 1984) .................................................................14

In re Colonial Realty Co.,
  980 F.2d 125 (2d Cir. 1992) ..............................................................................28

In re Exec. Tech. Data Sys.,
  79 B.R. 276 (Bankr. E.D. Mich. 1987) ..............................................................31

In re Fairchild Aircraft Corp.,
  126 B.R. 717 (Bankr. W.D. Tex. 1991) ...............................................................8

In re M.W. Sewall & Co.,

PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT

431 B.R. 526 (Bankr. D. Me. 2010) ................................................................. 15

In re N. Am. Coin & Currency, Ltd.,
767 F.2d 1573 (9th Cir. 1985) ........................................................................ 18

In re Onecast Media, Inc.,
439 F.3d 558 (9th Cir. 2006) .......................................................................... 30

Krazalic v. Republic Title Co.,
314 F.3d 875 (7th Cir. 2002) .......................................................................... 25

Ledo Fin. Corp. v. Summers,
122 F.3d 825 (9th Cir. 1997) .......................................................................... 21

Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n,
869 F.2d 719 (3d Cir. 1989) ........................................................................... 25

Lubin v. FDIC,
No. 1:10-CV-00874, 2011 WL 825751 (N.D. Ga. Mar. 2, 2011) ................... 23

Mahon v. Stowers,
416 U.S. 100 (1974) ........................................................................................ 18

Marvel Entertainment Group, Inc. v. Mafco Holdings, Inc.,
273 B.R. 58 ( D. Del. 2002) ........................................................................... 21

O'Melveny & Myers v. FDIC,
512 U.S. 79 (1994) .......................................................................................... 21

Pan Am. World Airways, Inc. v. Shulman Transp. Enters., Inc
(In re Shulman Trans. Enters., Inc.),
744 F.2d 293 (2d Cir. 1984) ........................................................................... 17

Parker v. Saunders (In re Bakersfield Westar, Inc.),
226 B.R. 227 (B.A.P. 9th Cir. 1998) ............................................................... 29

Resolution Trust Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.),
182 B.R. 859 (D. Kan. 1995) ............................................................... 9, 12-13

Richardson v. FDIC (In re M. Blackburn Mitchell, Inc.),
164 B.R. 117 (Bankr. N.D. Cal. 1994) ........................................................... 17

RTC v. Mgmt., Inc.,
25 F.3d 627 (8th Cir. 1994) ............................................................................ 29

Schwartz v. United States (In re Schwartz),
954 F.2d 569 (9th Cir. 1992) .......................................................................... 28

Segal v. Rochelle,
382 U.S. 375 (1966) ........................................................................................ 28

Superintendent of Ins. v. First Cent. Fin. Corp.
(In re First Cent. Fin. Corp.),
269 B.R. 481 (Bankr. E.D.N.Y. 2001) .............................. 9, 12-15, 17, 19, 24

- iii -

Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.),
    377 F.3d 209 (2d Cir. 2004) ................................................................. 9, 18, 20

Seidman v. OTS (In re Seidman),
    37 F.3d 911 (3d Cir. 1994) ............................................................................ 25

Taunton Mun. Lighting Plant v. Enron Corp. (In re Enron Corp.),
    354 B.R. 652 (S.D.N.Y. 2006) ...................................................................... 31

Team Fin. Inc. v. FDIC (In re Team Fin., Inc.),
    Adv. No. 09-5084, 2010 WL 1730681 (Bankr. D. Kan. Apr. 27, 2010) ........12-14, 24, 26

Thompkins v. Lil' Joe Records, Inc.,
    476 F.3d 1294 (11th Cir. 2007) ............................................................... 30, 31

Top Rank, Inc. v. Ortiz (In re Ortiz),
    400 B.R. 755 (C.D. Cal. 2009) ...................................................................... 31

United Dominion Indus. v. United States,
    532 U.S. 822 (2001) ...................................................................................... 21

United States v. MCorp Fin., Inc. (In re MCorp Fin., Inc.),
    170 B.R. 899 (S.D. Tex. 1994) ............................................................... 12, 14, 20

United States v. Sims (In re Feiler),
    218 F.3d 948 (9th Cir. 2000) ......................................................................... 28

United States v. Carey (In re Wade Cook Fin. Corp.),
    375 B.R. 580 (B.A.P. 9th Cir. 2007) .............................................................. 28

W. Dealer Mgmt., Inc. v. England
(In re Bob Richards Chrysler-Plymouth Corp.),
    473 F.2d 262 (9th Cir. 1973) ................................................................. 9, 19, 20, 24

Weststeyn Dairy 2 v. Eades Commodities Co.,
    280 F. Supp. 2d 1044 (E.D. Cal. 2003) ......................................................... 14

WRH Mortgage, Inc. v. S.A.S. Assocs.,
    214 F.3d 528 (4th Cir. 2000) ......................................................................... 30

Wyeth v. Levine,
    129 S. Ct. 1187 (2009) .................................................................................. 27

XL/Datacomp v. Wilson (In re Omegas Grp.),
    16 F.3d 1443 (6th Cir. 1994) ......................................................................... 18

Zucker v. FDIC (In re NetBank, Inc.),
    Adv. No. 3:08-ap-00346 (Bankr. M.D. Fla. Sept. 30, 2010) . 12-15, 17, 22, 24-25, 29, 31

## STATUTES

11 U.S.C. § 362(a)(3) .......................................................................................... 28

11 U.S.C. § 362(a)(6) .......................................................................................... 29

11 U.S.C. § 365(a) ................................................................................................ 30

11 U.S.C. § 365(d)(1) ........................................................................................... 30

11 U.S.C. § 365(g)(1) ........................................................................................... 31

11 U.S.C. § 502(g)(1) ........................................................................................... 31

12 C.F.R. § 571.7(b). ........................................................................................... 25

28 U.S.C. § 157 ...................................................................................................... 7

28 U.S.C. § 157(b) ................................................................................................. 8

28 U.S.C. § 1334 .................................................................................................... 7

28 U.S.C. § 1334(e) ............................................................................................... 7

28 U.S.C. § 1408 .................................................................................................... 8

28 U.S.C. § 1409 .................................................................................................... 8

26 C.F.R. § 1.1502-77 .......................................................................................... 23

26 C.F.R. § 1.1502-77(a)(1)(i) ............................................................................ 24

26 C.F.R. § 1.1502-77(a)(2)(i)-(xii) .................................................................. 24

26 C.F.R. § 1.1502-77(a)(2)(v) ........................................................................... 10

63 Fed. Reg. at 64,757 ................................................................................... 25, 26

63 Fed. Reg. at 64,758 ................................................................................... 26, 27

63 Fed. Reg. at 64,759 ................................................................................... 25, 26

## **RULES**

Fed. R. Bankr. P. 7056 .......................................................................................... 8

Fed. R. Civ. P. 56(a) .............................................................................................. 8

Fed. R. Civ. P. 56(g) ............................................................................................ 32

PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT

## NOTICE OF MOTION AND MOTION

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE, AND TO ALL PARTIES ENTITLED TO NOTICE HEREIN AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, pursuant to Rules 56(a) and (d) of the Federal Rules of Civil Procedure, made applicable herein by Federal Rule of Bankruptcy Procedure 7056, and Local Bankruptcy Rule 7056-1, Plaintiff Alfred H. Siegel, Chapter 7 Trustee (the "Trustee") hereby moves for summary judgment on the Trustee's Fifth Claim for Relief in the *First Amended Complaint: (1) Objecting to FDIC Claim; (2) for Subordination of FDIC Claim; (3) Counterclaim for Declaratory Relief* (the "First Amended Complaint").  This motion is based upon this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the *Declarations of Benjamin P. Saul* (the "Saul Decl.") *and Susan P. Tomlinson* (the "Tomlinson Decl.") *in Support of Plaintiff's Notice of Motion and Motion for Summary Judgment on Plaintiff's Fifth Claim for Relief, or, in the Alternative, for an Order that Certain Material Facts Are Not Genuinely in Dispute* filed concurrently herewith, and such additional evidence as the Court may properly consider, whether by way of judicial notice or otherwise, in connection with this motion.

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held on the Trustee's motion on May 31, 2011 at 2:00 p.m., or as soon thereafter as counsel may be heard, in Courtroom 1475 of the Roybal Federal Building at 255 East Temple Street, Los Angeles, California 90012.  Pursuant to Local Bankruptcy Rule 7056-1(c)(1), any response or opposition to this motion must be in writing and must be filed with the Court and served upon counsel for the Trustee at the address set forth in the upper left-hand corner of the first page hereof not later than 21 days before the date of the hearing on this motion.

**WHEREFORE**, the Trustee respectfully requests that the Court enter an order (i) summarily adjudicating the Trustee's Fifth Claim for Relief in the First

1  Amended Complaint or, in the alternative, (ii) establishing material facts that are not

2  genuinely at issue, pursuant to Fed. R. Civ. P. 56(g); and (iii) granting such other relief

3  as may be appropriate under the circumstances.

4

5  Dated:  April 19, 2011              KLEE, TUCHIN, BOGDANOFF & STERN LLP

6                                      By:_____

7                                      Lee R. Bogdanoff (State Bar No. 119542)
                                       David M. Stern (State Bar No. 67697)
8                                      Matthew C. Heyn (State Bar No. 227474)

9                                      General Bankruptcy Counsel for Plaintiff and Chapter 7
10                                     Trustee Alfred H. Siegel

11                                     BUCKLEYSANDLER LLP
12                                     Andrew L. Sandler *(Admitted Pro Hac Vice)*
                                       Benjamin B. Klubes *(Admitted Pro Hac Vice)*
13                                     Benjamin P. Saul *(Admitted Pro Hac Vice)*

14                                     Special Counsel for Plaintiff and Chapter 7 Trustee
15                                     Alfred H. Siegel

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Alfred H. Siegel, Chapter 7 Trustee of the bankruptcy estate of IndyMac Bancorp, Inc. ("Bancorp") and Plaintiff in this action (the "Trustee"), submits this Memorandum of Points and Authorities in support of his Motion for Summary Judgment (the "Motion") on the Fifth Claim for Relief in the Trustee's *First Amended Complaint: (1) Objecting to FDIC Claim; (2) for Subordination of FDIC Claim; (3) Counterclaim for Declaratory Relief* (the "First Amended Complaint").  In the Motion, the Trustee seeks a declaration that over $53 million in received and anticipated tax refunds due under consolidated and combined federal and state tax returns filed by Bancorp and the Trustee (collectively, the "Tax Refunds") are property of Bancorp's bankruptcy estate.

To resolve the Motion, the Court need only read the Amended and Restated Tax Sharing Agreement (the "TSA") entered into by Bancorp and IndyMac Bank, F.S.B. (the "Bank").  The TSA, by its plain terms, provides for Bancorp to "reimburse" or "pay" to the Bank amounts equal to any tax refunds the Bank would have hypothetically received had it filed separate tax returns.  This language establishes that Bancorp and the Bank formed a typical debtor-creditor relationship with respect to the Tax Refunds.  Under well-settled law, because Bancorp is the Bank's debtor vis-à-vis all Tax Refunds to which Bancorp is entitled from the taxing agencies, those refunds are property of Bancorp's estate.  The Federal Deposit Insurance Corporation ("FDIC"), as receiver for the Bank, has at most, a general unsecured claim arising out of the Bank's contractual right under the TSA to "reimbursement" or "payment" of certain amounts, which could differ materially from any Tax Refunds that the Trustee actually receives.  This conclusion accords with the decisions of *every* court to consider a tax allocation agreement like the TSA, including decisions arising from disputes between insolvent holding companies and their failed subsidiaries in an FDIC receivership or an analogous insolvency proceeding.

- 3 -

1      Despite the plain language of the TSA and an overwhelming weight of precedent

2   supporting the estate's entitlement to immediate payment, possession, and ownership of

3   all the Tax Refunds, the FDIC insists that the Tax Refunds are its property because

4   Bancorp allegedly holds the refunds in trust for the Bank.[1]  The FDIC wants priority

5   over all other creditors for one of the largest assets of the Bancorp estate.  Nothing in the

6   TSA supports the FDIC's position.  The FDIC's position also finds no support in either

7   statute or regulation as both are silent on the question of ownership of tax refunds as

8   between a parent and its subsidiary.  The relevant case law likewise provides no support

9   for the FDIC's contention.  In fact, the only decisions that the FDIC will be able to cite

10  in support of its untenable position are all inapposite, because either (i) unlike here, no

11  tax allocation agreement between the parties existed, or (ii) the tax allocation

12  agreements in those cases were materially different from the TSA.

13      This matter is ripe to be resolved now by summary judgment as no genuine issues

14  of material fact exist and the Tax Refunds are, as a matter of law, the property of

15  Bancorp's bankruptcy estate.  Accordingly, the Court should grant the Trustee's Motion.

16  **II.    STATEMENT OF UNDISPUTED FACTS**

17      The following facts are undisputed and are lodged on the *Statement of*

18  *Uncontroverted Facts in Support of Plaintiff's Notice of Motion and Motion for*

19  *Summary Judgment on Plaintiff's Fifth Claim for Relief, or, in the Alternative, for, an*

20  *Order that Certain Material Facts Are Not Genuinely in Dispute*:

21      1.    At all times material to this adversary proceeding, Bancorp was the

22          indirect parent company of the Bank.  Specifically, Bancorp held the stock of

23          IndyMac Intermediate Holdings, Inc., which in turn held the Bank's stock.  Saul

24          Decl. ¶ 4.  Bancorp was and remains the designated parent company in the

25

26  [1] On November 25, 2008, the FDIC as Receiver of the Bank filed a Proof of Claim in the bankruptcy
    case asserting, among other things, that it is entitled to recover certain federal and state tax refunds as

27  purported property of the Bank.  This adversary proceeding includes, *inter alia*, objections to the
    allowance and priority of all claims asserted in that Proof of Claim.

28                                          - 4 -

Bancorp consolidated tax group, which includes, *inter alia*, the Bank and the Bank's subsidiaries. Tomlinson Decl. ¶ 3.

2.      On February 6, 2003, Bancorp and the Bank entered into the Amended and Restated Tax Sharing Agreement.  Saul Decl. ¶ 15, Ex. 4.

3.      Bancorp filed federal and state consolidated or combined tax returns on behalf of itself and its subsidiaries—including the Bank—for the 2000, 2001, 2002, 2003, 2004, 2005 and 2006 tax years.  Tomlinson Decl. ¶¶ 3 &19, Exs. 9, 10, 11, 12, 13, 24, 25, 26 & 27.

4.      On July 11, 2008, the Office of Thrift Supervision ("OTS") closed the Bank and the Defendant FDIC was appointed as receiver.  Saul Decl. ¶ 7, Ex. 1.

5.      On July 31, 2008 (the "Petition Date"), Bancorp filed a petition for relief under chapter 7 of the Bankruptcy Code and, on August 4, 2008, Alfred H. Siegel was appointed Interim Chapter 7 Trustee.  On December 4, 2008, the Court entered an order duly appointing Mr. Siegel permanent Chapter 7 Trustee.  Saul Decl. ¶ 3.

6.      Without seeking or obtaining relief from the automatic stay in effect in the Bankruptcy Case under 11 U.S.C. § 362, the FDIC sent a letter dated August 15, 2008 addressed to "Indymac Bancorp, Inc., Attn: Mr. Michael W. Perry, C/O Edwin Woodsome," stating that the FDIC "elected to disaffirm the [TSA] to the full extent, if any, that it represents an enforceable obligation of the Institution or the Receiver."  On September 4, 2008, the Trustee sent a letter to the FDIC stating that he "does not in any way consent to this action [purporting to repudiate the TSA], and reserves all rights with respect thereto."  Saul Decl. ¶ 8, Exs. 2 & 3.

7.      On September 15, 2008, the Trustee filed, on behalf of Bancorp and its subsidiaries, including the Bank, a 2007 consolidated federal tax return.  Under this 2007 consolidated tax return, a refund of approximately $2,280,000 is due

- 5 -

for the 2007 tax year.  Tomlinson Decl. ¶ 7, Ex. 16.  In addition, on or about September 15, 2008, the Trustee filed, on behalf of Bancorp, an application for a refund of $11,520,072 for the 2005 tax year as a result of carrying back the consolidated net operating loss ("CNOL") reported on the 2007 consolidated federal tax return to the 2005 tax year.  The net refund due as a result of carrying back the CNOL reported on the 2007 consolidated federal tax return to the 2005 tax year was $10,584,840.  Tomlinson Decl. ¶ 8, Exs. 9, 17& 18.

8.      Without seeking or obtaining relief from the automatic stay, the FDIC filed a competing 2007 federal tax return and a 2005 amended federal tax return on behalf of the Bank and its subsidiaries on or around September 15, 2008, both of which sought a smaller refund for the 2007 and 2005 tax years.  Tomlinson Decl. ¶ 6, Exs. 14 & 15.

9.      On November 15, 2010, the IRS issued two checks for $5,737,760.08 each, totaling $11,475,520.16, as payment of the $10,584,840 refund due as a result of carrying back the CNOL reported on the 2007 consolidated federal tax return to the 2005 tax year plus $890,680 in interest.  Saul Decl. ¶ 14; Tomlinson Decl. ¶ 9.

10.     Pursuant to the *Stipulation for Entry of Order re: Escrow Account Relating to Tax Refund Claims and Reservation of Rights With Respect to Tax Appeal, Assessment, and Refund Proceedings* which was entered into by the Trustee and the FDIC on September 10, 2009 and approved by the Court on September 15, 2009, and the *Further Stipulation for Entry of Order re: Establishment of Bank Account Relating to Tax Refund Claims*, which was entered into by the Trustee and the FDIC on May 24, 2010 and approved by the Court on May 27, 2010, the two checks were deposited in a joint interest-bearing account at Citibank, N.A. (the "Joint Account") on or about November 22, 2010.  Saul Decl. ¶ 14.

11.     The Trustee filed, on behalf of Bancorp and its subsidiaries, including the

- 6 -

Bank, a 2008 consolidated federal tax return on or around September 15, 2009, and an amended return on or around September 13, 2010, on which the Trustee reported a CNOL of $610,965,432 for the IndyMac Bancorp consolidated tax group. Tomlinson Decl. ¶ 10, Exs. 19 & 20.

12.     On or around January 27, 2011, the Trustee filed, on behalf of Bancorp and its subsidiaries, including the Bank, amended consolidated federal tax returns for tax years 2003, 2004, and 2005 carrying back the CNOL reported on the 2008 consolidated federal tax return to offset tax liabilities in the 2003, 2004, and 2005 tax years. Tomlinson Decl. ¶ 11, Exs. 21, 22 & 23.

13.     On or about August 18, 2008, the IRS filed a proof of claim for $27,858,012.46 for the tax liability of the IndyMac Bancorp consolidated tax group. The IRS amended its proof of claim several times and, pursuant to the *Stipulation to Lift Automatic Stay and Permit Offset of Federal Employment Tax*, which was filed on September 30, 2010 and approved by order entered October 8, 2010, the IRS was granted relief from the automatic stay to offset refunds against the tax liability of the consolidated tax group in settlement of the IRS's proof of claim. Saul Decl. ¶ 13.

14.     All told, the Trustee's professionals estimate that Bancorp has received or will receive approximately $53 million in tax refunds, which are due under consolidated and combined federal and state tax returns filed by Bancorp and the Trustee (including the $11,475,520.16 that the IRS has already paid). Tomlinson Decl. ¶ 23.

## III.    **JURISDICTION AND VENUE**

This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Indeed, because the Motion seeks a determination of property of the Bancorp estate, this Court has exclusive jurisdiction under 28 U.S.C. § 1334(e). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a "core" proceeding as that term is

- 7 -

defined in 28 U.S.C. § 157(b).  The case law makes clear that federal bankruptcy courts are "an appropriate forum in which to determine the competing rights of parties in a tax refund resulting from a consolidated return, where one of the parties is a debtor in bankruptcy."  In re Fairchild Aircraft Corp., 126 B.R. 717, 720 (Bankr. W.D. Tex. 1991).

## IV.    ARGUMENT

### A.    Standard for summary judgment.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056 (Fed. R. Civ. P. 56 applicable in bankruptcy adversary proceedings); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A fact is "material" when, under the governing substantive law, it could affect the outcome of the case, and a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

### B.    The Tax Refunds are property of the Bancorp estate.

Bancorp's bankruptcy estate owns the Tax Refunds.  Both the TSA and governing case law compel this result.  Indeed, every court to consider tax sharing agreements comparable to the one at issue, including several recent rulings on agreements between insolvent holding companies and failed banks, has held that consolidated tax refunds generated from CNOLs are property of the parent company's bankruptcy estate.  This Court should reach that same conclusion here.

#### 1.    The TSA establishes a debtor-creditor relationship; thus the Tax Refunds are property of the estate.

To resolve ownership disputes over tax refunds between a parent corporation and its subsidiary, courts examine whether the parent and the subsidiary had either (i) a debtor-creditor relationship or (ii) a trust or agency relationship with respect to the

- 8 -

1   refunds.  See, e.g., Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav.

2   Corp.), 159 B.R. 9 (Bankr. D. Kan. 1993), aff'd sub nom. Resolution Trust Corp. v.

3   Franklin Sav. Ass'n (In re Franklin Sav. Corp.), 182 B.R. 859 (Bankr. D. Kan. 1995).  In

4   a debtor-creditor relationship, the parent owns the refunds and the subsidiary has a claim

5   as a creditor against the parent for any amount to which it may be entitled under a tax

6   allocation agreement.  In a trust or agency relationship, the parent holds the refunds in

7   trust for the subsidiary.  If a court determines that a debtor-creditor relationship exists

8   with respect to any tax refunds, then, in the context of a parent corporation in

9   bankruptcy, those tax refunds are property of the bankruptcy estate and the subsidiary

10  must seek payment of amounts due under the parties' agreement as a general unsecured

11  creditor of the estate.  Id.

12          Every court to address the issue of tax refund ownership between a parent

13  corporation and its subsidiary has held that parties (i) may define their relationship vis-

14  à-vis any consolidated tax refunds by agreement and (ii) when they do, the terms of that

15  agreement govern the determination of the parent-subsidiary relationship (i.e., debtor-

16  creditor versus a trust or agency relationship) and, in turn, ownership of the tax refunds.

17  See, e.g., W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth

18  Corp.), 473 F.2d 262, 264 (9th Cir. 1973) ("[A]s a matter of state corporation law the

19  parties are free to adjust among themselves the ultimate tax liability."); Superintendent

20  of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.), 269 B.R. 481, 490 (Bankr.

21  E.D.N.Y. 2001) (explaining that the parties' relationship was one of debtor and creditor

22  where they have a tax sharing agreement), aff'd sub nom. Superintendent of Ins. v. Ochs

23  (In re First Cent. Fin. Corp.), 377 F.3d 209 (2d Cir. 2004).  In this case, Bancorp and the

24  Bank defined their debtor-creditor relationship in the TSA; that agreement will control

25  any determination regarding ownership of the Tax Refunds.

28                                          - 9 -

1        The TSA provides, among other things, that Bancorp shall prepare, file,

2  prosecute, and settle all tax returns on behalf of the consolidated group[2] and determine

3  whether any refunds shall be paid as a refund or credited against future taxes.  TSA § 5.

4  Bancorp is also responsible under the TSA to pay all of the consolidated group's tax

5  liability.  TSA § 2.  Each subsidiary of Bancorp, including the Bank, is required to pay

6  to Bancorp the amount of its hypothetical separate tax liability, calculated as if it had

7  filed a separate federal or state income tax return.  Id.  The TSA expressly authorizes

8  Bancorp, in its "sole discretion," to determine whether any tax refunds to which the

9  consolidated group is entitled will be paid or credited against future tax liability of the

10  consolidated group.  TSA § 5.  Any payment of refunds is made directly to Bancorp.

11  See 26 C.F.R. § 1.1502-77(a)(2)(v) ("The common parent files claims for refund, and

12  any refund is made directly to and in the name of the common parent and discharges any

13  liability of the Government to any member with respect to such refund[.]").

14        The TSA also provides for "payment" or "reimbursement" from Bancorp to the

15  Bank under certain conditions if the Bank suffers losses that would have entitled it to a

16  refund had it filed separate tax returns.  In the case of the Bank having current losses,

17  the TSA states that Bancorp "shall reimburse" the Bank for the Bank's current losses,

18  but only in "an amount equal to the amount the Bank Group would have received had it

19  carried back the current losses against the Bank Group's separate taxable income in

20  prior years."[3]  TSA § 3.  In the case of subsequent adjustments to income, gains, losses,

21

---

22  [2] The TSA defines the consolidated group as "the affiliated group of corporations within the meaning of
Section 1504(a) of the [Internal Revenue] Code or similar group of corporations pursuant to any State
23  Code of which [Bancorp] is the common parent."  TSA § 1(c).

24  [3] The full provision states:

25      Parent [Bancorp] shall _reimburse_ the Bank for any of the Bank Group's current losses
      used to compute the Group's Consolidated Tax Liability, but only to the extent the Bank
26      Group would be able to carry back such losses to prior years to offset the Bank Group's
      separate taxable income used in computing the Separate Tax Liability for those
27      years . . . .  _Reimbursement_ shall be _an amount equal_ to the amount the Bank Group
      would have received had it carried back the current losses against the Bank Group's

*(cont'd)*

28

PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT

1   deductions or credits, the TSA requires "payment" by Bancorp to the Bank if the

2   adjustment would have resulted in a smaller hypothetical separate tax liability for the

3   Bank.[4]  TSA § 4(a).  In both cases, "reimbursement" or "payment" is to be made within

4   15 business days (i.e., three weeks or more) after Bancorp actually receives the tax

5   refund from the IRS or state taxing authority.  TSA §§ 3 & 4(a).  The terms

6   "reimbursement" and "payment" are indicative of a debtor-creditor relationship and, in

7   comparison, are completely *inconsistent* with the existence of a trust or agency

8   relationship.

9       In addition, the following key aspects of the TSA demonstrate that a debtor-

10  creditor relationship exists with respect to the Tax Refunds and that the Bank is only

11  entitled to reimbursement as a creditor in the amount provided for in the TSA:

12      •   The TSA does not limit Bancorp's use of the refunds and does not suggest

13             that the reimbursement or payment that Bancorp is required to make—15

14             business days later—must be from the same funds that Bancorp received from

15             the taxing authority.  Before payment to the Bank, Bancorp has complete

---

16        separate taxable income in prior years.  *Reimbursement* shall be made no later than
17        fifteen (15) business days after the Consolidated Return for such taxable period is filed
           or the Group's refund is received, whichever is later.

18  TSA § 3 (emphasis added).

19  [4] The full provision states:

20        If any adjustments are made to the income, gains, losses, deductions, or credits of the
21        Group for a taxable year during which the Bank is a member, whether by reason of the
           filing of an amended return or a claim for refund with respect to such taxable year or an
22        audit with respect to such taxable year by the IRS or a State Authority, the amounts due
           under this Agreement for such taxable year shall be redetermined by taking into account
23        such adjustments.  If, as a result of such redetermination, any amounts due under this
           Agreement shall differ from the amounts previously paid, then *payment* of such
24        difference shall be made . . . by Parent to the Bank, in the case of an adjustment
           resulting in a smaller Separate Tax Liability for the Bank, not later than fifteen (15)
25        business days after the date on which such reduction in the Bank's Separate Tax
           Liability is credited in determining the Consolidated Tax Liability or, if resulting in a
26        refund, such refund is received, or . . . .

27  TSA § 4(a) (emphasis added).

28

PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT

dominion and control over all funds received from the taxing authority, and the Bank's rights are limited to the expectancy of payment of a contractually calculated sum at a future date.

- Bancorp is required to reimburse the Bank (i) whether or not the consolidated group is due any refund or (ii) if a refund is due, whether or not Bancorp elects to receive payment or takes a credit against future tax liability.  Thus, it is possible that no refund will be due and/or received and yet Bancorp must still pay the Bank the amount provided for in the TSA.

- Under the TSA, the Bank only receives an amount equal to the refund it would have received separately, which will often not equal the entire amount of the consolidated refund Bancorp receives.

### 2.    The overwhelming weight of precedent compels the conclusion that the TSA establishes a debtor-creditor relationship.

Every court to consider tax sharing agreements with the above characteristics has concluded a debtor-creditor relationship exists with respect to tax refunds under consolidated tax returns.  See United States v. MCorp Fin., Inc. (In re MCorp Fin., Inc.), 170 B.R. 899 (S.D. Tex. 1994); Zucker v. FDIC (In re NetBank, Inc.), Adv. Proc. No. 3:08-ap-00346-JAF, slip op. (Bankr. M.D. Fla. Sept. 30, 2010);[5] Team Fin. Inc. v. FDIC (In re Team Fin., Inc.), Adv. Proc. No. 09-5084, 2010 WL 1730681 (Bankr. D. Kan. Apr. 27, 2010);[6] First Cent. Fin., 269 B.R. 481 (Bankr. E.D.N.Y. 2001); In re Franklin Sav. Corp., 159 B.R. 9 (Bankr. D. Kan. 1993), aff'd, 182 B.R. 859 (D. Kan. 1995).  The rationales behind this established line of case law are dispositive of the Trustee's Motion for several reasons.

---

[5] A copy of the NetBank opinion is attached as Exhibit 6 to the Saul Declaration.  The NetBank opinion is presently on appeal to the U.S. District Court for the Middle District of Florida.

[6] A copy of the Team Financial opinion is attached as Exhibit 5 to the Saul Declaration.

1     <u>First</u>, courts have consistently concluded that the terms "reimbursement" and

2     "payment" evidence a debtor-creditor relationship.  In <u>Franklin Savings Corp.</u>, for

3     example, the Resolution Trust Corporation ("RTC"), as receiver of a failed subsidiary,

4     claimed ownership of consolidated tax refunds paid to the holding company that were

5     generated by the subsidiary's losses.  182 B.R. at 860.  The court held that the tax

6     refunds were property of the parent corporation's bankruptcy estate because a tax

7     sharing agreement provided that the subsidiary was entitled to "reimbursement" in the

8     amount of the refunds the subsidiary could have claimed had it filed separately.  <u>Id.</u> at

9     863.  As the court explained, the term "reimbursement" in the tax sharing agreement

10    "evidenced the parties' intent to create an obligation in the nature of a receivable,"

11    leaving the subsidiary "hold[ing] only an unsecured claim to the funds, not ownership of

12    the refunds."  <u>Id.</u>  The court, moreover, noted how the term "reimburse" was wholly

13    inconsistent with the RTC's argument that the tax refunds were somehow "held in trust

14    for the benefit of the subsidiary to be automatically turned over to it."  <u>Id.</u>

15         Courts have reached the same conclusion based on tax agreements that require

16    parents to "pay" to their subsidiaries amounts equal to the separate tax refunds the

17    subsidiaries would have received, because "pay" is a term that also denotes a debtor-

18    creditor relationship and is inconsistent with a trust or agency relationship.  <u>See</u>

19    <u>NetBank</u>, slip op. at 17 (finding debtor-creditor relationship based on agreement that

20    used the term "payment"); <u>Team Fin.</u>, 2010 WL 1730681, at *10-12 (finding debtor-

21    creditor relationship based on agreement that used the terms "pay" and "payable"); <u>First</u>

22    <u>Cent. Fin.</u>, 269 B.R. at 497 (finding debtor-creditor relationship based on agreement that

23    used the terms "payment" and "settlement").  Consistent with the tax allocation

24    agreements in these decisions, the TSA repeatedly provides for "reimbursement" and

25    "payment" to the Bank of amounts the Bank would have theoretically obtained had it

26    filed separate tax returns.  The TSA's use of these terms creates a contractual unsecured

27    "claim" in favor of the Bank.

28

- 13 -

1    <u>Second</u>, courts have found that the absence of provisions in tax sharing

2    agreements requiring the parent to segregate or immediately transfer to the subsidiary

3    the tax refunds upon receipt, or to expressly hold them in trust, further evidences that the

4    parent is not the subsidiary's trustee.  <u>See</u> <u>MCorp</u>, 170 B.R. at 902; <u>NetBank</u>, slip op. at

5    16; <u>Team Fin.</u>, 2010 WL 1730681, at *5; <u>First Cent. Fin.</u>, 269 B.R. at 497-98.  The

6    absence of such a provision in the TSA similarly indicates that a debtor-creditor

7    relationship exists.  Indeed, the Ninth Circuit Court of Appeals reached that conclusion

8    in <u>Foothill Capital Corp. v. Clare's Food Market, Inc. (In re Coupon Clearing Service,</u>

9    <u>Inc.)</u>, 113 F.3d 1091 (9th Cir. 1997), a decision applying California trust and agency law

10   in the context of a chapter 7 bankruptcy.

11        Specifically, in that case, the court expressly rejected the suggestion of certain

12   retailers that coupon proceeds received by the debtor were held "in trust" for their

13   benefit and thus did not belong to the debtor, emphasizing that "none of the [relevant

14   contracts] imposed any obligation on [the debtor] to segregate amounts received from

15   manufacturers or forbade the commingling of such accounts with [the debtor's] general

16   funds."  <u>Id.</u> at 1101.  In the process, the Ninth Circuit favorably cited <u>In re Black &</u>

17   <u>Geddes, Inc.</u> for the "firmly established principle that if a recipient of funds is not

18   prohibited from using them as his own and commingling them with his own monies, a

19   debtor-creditor, not a trust, relationship exists."  35 B.R. 830, 836 (Bankr. S.D.N.Y.

20   1984); <u>see also, e.g.</u>, <u>Altura P'ship v. Breninc, Inc. (In re B.I. Fin. Servs. Grp., Inc.)</u>, 854

21   F.2d 351, 354-55 (9th Cir. 1988) (concluding that party asserting trust theory against a

22   debtor's estate failed to meet its burden to establish such a trust under California law

23   because the relevant contracts never used the word "trust" and the debtor controlled and

24   could commingle the funds); <u>Weststeyn Dairy 2 v. Eades Commodities Co.</u>, 280 F. Supp.

25   2d 1044, 1081 (E.D. Cal. 2003) (following the Ninth Circuit's teachings that "[w]here

26   there is no agreement by the parties to segregate prepayments or to forbid the

27   commingling of such prepayments with a party's general funds, such prepayments are

28

1   not held in trust"); <u>In re M.W. Sewall & Co.</u>, 431 B.R. 526, 529-32 (Bankr. D. Me. 2010)

2   (rejecting creditor's efforts to exclude funds delivered to the debtor pre- and post-

3   petition from property of the estate on "trust" and "conduit" theories where the debtor

4   had absolute control over those funds and could use the funds for any purpose; the

5   debtor's obligations to the creditor were merely general unsecured claims).

6        <u>Third</u>, the court in <u>First Central Financial</u> found it significant that the tax sharing

7   agreement in that case limited the subsidiary's reimbursement to an amount equal to the

8   tax refund the subsidiary would have hypothetically obtained on a separate basis, an

9   amount less than the actual amount of any consolidated tax refunds.  <u>First Cent. Fin.</u>,

10  269 B.R. at 496.  Thus, noted the court, "the Tax Refund in its entirety is clearly not

11  property of the [subsidiary]" and nothing in the agreement provided that any portion of

12  the refund would be segregated or held in trust.  <u>Id.</u>  Likewise, Bancorp's reimbursement

13  obligation may not equal the full amount of any consolidated tax refunds.

14       <u>Fourth</u>, the court in <u>NetBank</u> found the fact that the parent corporation was

15  obligated to pay the subsidiary bank "regardless of whether the Consolidated Group is

16  receiving a refund" indicative of a debtor-creditor relationship.  <u>See</u> <u>NetBank</u>, slip op. at

17  23.  Similarly, the TSA does not make Bancorp's reimbursement obligation contingent

18  on Bancorp's receipt of any refunds.  It is impossible for Bancorp to hold in trust for the

19  Bank refunds that Bancorp never receives.  Rather, as was true in <u>In re Coupon Clearing</u>

20  <u>Service</u>, the fact that Bancorp agreed to "a fixed payment schedule regardless of when

21  payment is received from a third party" (<i>i.e.</i>, the taxing authorities) further demonstrates

22  the clear intent of the parties that the TSA create a debtor-creditor relationship, one that

23  gave the Bank a contractual right to future payment of certain amounts but nothing more.

24  <u>See</u> 113 F.3d at 1101-02.

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT

### 3. The TSA does not establish an agency relationship with respect to tax refunds.

Nothing in the TSA makes Bancorp a formal agent of the Bank for the purpose of holding or transferring tax refunds to the Bank. To the contrary, the TSA authorizes Bancorp to perform the procedural functions necessary to file consolidated tax returns and vests in Bancorp "*sole discretion*" (i) to prepare returns, request extensions, and determine the Bank's elections; (ii) to contest, compromise, or settle adjustments or deficiencies; (iii) to file, prosecute, compromise, or settle any claim for a refund; and (iv) to determine whether any refunds should be paid by way of refund or credited against the tax liability of the consolidated group. TSA § 5(a)-(d). Although the TSA continues by stating, "The Bank hereby appoints Parent as its agent and attorney-in-fact to take such action (including the execution of documents) as Parent may deem appropriate to effect the foregoing," id. at § 5(d), that provision (i) is the only time the word "agent" ever appears in the TSA, (ii) only appoints Bancorp as an "agent" for the specified procedural matters, and (iii) certainly does not designate Bancorp as the Bank's agent generally or specifically for the purpose of holding or transferring tax refunds. In fact, as the TSA makes clear, Bancorp had "*sole discretion*" with respect to the listed procedural matters. TSA § 5 (emphasis added). Given Bancorp's unbounded discretion as to these procedural matters described in the TSA and the corollary inability of the Bank to control how Bancorp handled them, the limited reference to the word "agent" in section 5 of the TSA cannot give rise to any agency relationship (let alone one with regard to the holding or transferring of tax refunds). See, e.g., In re Coupon Clearing Serv., 113 F.3d at 1099-1101 (affirming finding under California law that debtor did not have an agency relationship with retailers where those parties lacked control over the debtor's means and methods of implementing certain service agreements).

As to all tax refunds, the TSA makes clear that Bancorp has unrestricted dominion and control over all tax refunds after their receipt and before payment to the

- 16 -

1 Bank, during which time Bancorp has no obligations whatsoever to report to or

2 otherwise follow the direction of the Bank regarding the received funds. TSA §§ 3 &

3 4(a). Again, because the TSA gives Bancorp complete discretion and control under

4 such circumstances, Bancorp is not the Bank's agent. See, e.g., Pan Am. World

5 Airways, Inc. v. Shulman Transp. Enters., Inc (In re Shulman Trans. Enters., Inc.), 744

6 F.2d 293, 295-96 (2d Cir. 1984) (describing how the "essential characteristic of an

7 agency relationship is that the agent acts subject to the principal's direction and control,"

8 and, as in In re Coupon Clearing Service, determining that a typical debtor-creditor

9 relationship existed where third party did not have control or segregation rights

10 regarding how bankrupt entity handled monies it collected); Richardson v. FDIC (In re

11 M. Blackburn Mitchell, Inc.), 164 B.R. 117, 125 (Bankr. N.D. Cal. 1994) (finding that

12 the FDIC was not holding "funds in trust, or as agent, for any other party" where it

13 "obtained full dominion and control over the funds with the right to put the money to its

14 own purposes"); accord Bonded Fin. Servs. v. Euro. Am. Bank, 838 F.2d 890 (7th Cir.

15 1988) (establishing seminal test for party's status as a "conduit" or "transferee" under

16 Bankruptcy Code section 550(a), which turns on the extent of that party's dominion or

17 control over transferred funds).

18     In cases involving tax sharing agreements with language similar to the TSA,

19 courts have rejected the argument that such agreements establish an agency relationship

20 as to the tax refunds. See First Cent. Fin., 269 B.R. at 497 (stating that tax allocation

21 agreement did not create trust relationship because parent "does not act at [subsidiary's]

22 direction and control, either in applying for a tax refund, or in the handling of the refund

23 monies once received"); NetBank, slip op. at 26 (explaining that relationship established

24 by tax sharing agreement lacks "essential characteristic of an agency relationship,"

25 namely, "that the agent acts subject to the principal's direction and control").

26     As with the mere reference to the word "agent" in section 5 of the TSA, the

27 TSA's statement of general intent does not make Bancorp the agent of the Bank with

28

- 17 -

1    respect to the Tax Refunds.  The preamble to the TSA states that the "intent of this

2    agreement" is for the Bank "to determine its tax liability and to make and receive

3    payments as if it were filing income tax returns separate from and excluding [Bancorp]"

4    and that "[a]ll of the following provisions should be interpreted in light of this general

5    intent."  TSA at 1.  The debtor-creditor relationship the TSA establishes with respect to

6    tax refunds is completely consistent with the general intent of the agreement.  Bancorp

7    is obligated to reimburse or pay the Bank a fungible sum calculated by reference to the

8    refund the Bank would have hypothetically received had it filed separately.  TSA §§ 3 &

9    4.  Thus, the end result achieved by the TSA is the same as if the Bank had filed a

10   separate return.  That the Bank's intervening failure and Bancorp's bankruptcy causes

11   the Bank to receive less than it would have otherwise—as is the case with _all_ general

12   unsecured creditors—does not nullify the debtor-creditor relationship created by the

13   TSA.  The FDIC cannot counterfactually rewrite the nature of the relationship struck

14   between Bancorp and the Bank in order to elevate its claims against a limited estate.

15   See, e.g., Mahon v. Stowers, 416 U.S. 100, 105 (1974) (per curiam) ("This Court has

16   previously held that an ordinary debtor-creditor relationship requires more than the post-

17   bankruptcy disappointment of the creditor to convert it into a trust relationship.").[7]

18

19

20   _____

     [7] The distributional inequities associated with one creditor bootstrapping itself ahead of the line of other
21   creditors with interests in a pie that unfortunately is too small are readily apparent.  It is for this reason
     that "constructive trust" and similar theories are a disfavored attack on limited bankruptcy estates.  See,
22   e.g., In re First. Cent. Fin. Corp., 377 F.3d at 217-18 (explaining, in context of dispute about ownership
     of tax refunds received by the debtor-parent, that "[t]he tension between constructive trust law and
23   bankruptcy law is another reason to proceed with caution" and to require liquidator for the failed
     subsidiary to make a very compelling showing that a trust relationship was intended between the parties,
24   which it could not do); XL/Datacomp v. Wilson (In re Omegas Grp.), 16 F.3d 1443, 1452 (6th Cir. 1994)
     ("Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus
25   directly from competing creditors, not from the offending debtor."); In re N. Am. Coin & Currency, Ltd.,
     767 F.2d 1573, 1576 (9th Cir. 1985) (articulating why courts should "necessarily act very cautiously in
26   exercising such a relatively undefined equitable power in favor of one group of potential creditors at the
     expense of other creditors, for ratable distribution among all creditors is one of the strongest policies
27   behind the bankruptcy laws").

28                                                - 18 -

**C.   The <u>Bob Richards</u> rule is inapplicable when a tax sharing agreement governs the relationship between the parent and subsidiary, should not apply when the parent company is insolvent, and is outdated in any event.**

The FDIC undoubtedly will rely on a line of case law stemming from the <u>Bob Richards</u> decision.  This line of cases not only is highly distinguishable on the facts presented here, but also is of dubious continuing value in light of changes to the tax law and multiple Supreme Court opinions that undercut central premises of the <u>Bob Richards</u> opinion.  Hence, the Court should reject the FDIC's likely argument that this line of cases is of any importance here for several reasons.

<u>First</u>, these cases articulate a rule that, *in the absence of a tax sharing agreement to the contrary*, a parent corporation holds tax refunds attributable to losses of its subsidiary in trust for the subsidiary.  Thus, in <u>Bob Richards</u>, the first of this line of cases, the Ninth Circuit Court of Appeals acknowledged that parent and subsidiary corporations are free to allocate tax liability and refund-related obligations among themselves by contract.  473 F.2d at 264-65.  Because the parties in <u>Bob Richards</u> did not have a tax sharing agreement, the court found it necessary to devise a gap-filling rule: "*Absent any differing agreement* we feel that a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior or subsequent year should inure to the benefit of that member . . . ."  <u>Id.</u> (emphasis added).  The Ninth Circuit expressly acknowledged that its gap-filling rule does *not* apply when the parent and subsidiary have an agreement defining the relationship of the parties with respect to any tax refunds.  <u>Accord</u> <u>Brandt v. Fleet Capital Corp. (In re TMCI Elecs.)</u>, 279 B.R. 552, 558 (Bankr. N.D. Cal. 1999) ("To permit a bankrupt parent company to appropriate its bankrupt subsidiary's assets *absent an express or implied agreement to do so* unjustly enriches the parent (and the parent's creditors) to the jeopardy of the subsidiaries' creditors." (emphasis added)); <u>First Cent. Fin.</u>, 269 B.R. at 489-90 (detailing why <u>Bob Richards</u> does not govern issue

of tax refund ownership given existence of tax allocation agreement defining

relationship with respect to tax refunds).  Here, the TSA defines the relationship

between Bancorp and the Bank, making the <u>Bob Richards</u> gap-filling rule and decisions

following it irrelevant.

Second, the <u>Bob Richards</u> line of case law is also inapplicable because it rests on

an unjust enrichment theory that does not apply when the parent-consolidated taxpayer

is itself insolvent and in bankruptcy.  In <u>Bob Richards</u>, the bankrupt subsidiary sought to

recover tax refunds from its *solvent*, non-debtor parent under a theory of unjust

enrichment.  473 F.2d at 263.  When the parent is in bankruptcy, however, as was also

the case in <u>MCorp Financial</u>, "[t]he equities of unjust enrichment do not appear" and the

refunds remain property of the estate.  170 B.R. at 902; <u>see also</u> <u>In re First Cent. Fin.</u>

<u>Corp.</u>, 377 F.3d at 218 (describing adjusted equitable balancing that prevails in the

bankruptcy context, and concluding that, although the bankruptcy estate of a parent

entity "may have been enriched" as a result of its receipt of tax refunds, "it was not

unjustly enriched" and there was no equitable reason "to impose a constructive trust on

any portion of the refund").  Given Bancorp's insolvency and the unique role of the

Trustee in marshaling estate assets for a fair distribution to creditors, the <u>Bob Richards</u>

rule is inapplicable and the Tax Refunds are property of the estate.

Third, the <u>Bob Richards</u> line of case law is also inapplicable because its central

premises have been undermined by subsequent changes to the tax law and superseding

U.S. Supreme Court decisions.  As an initial matter, <u>Bob Richards</u> rests on the premise

that the subsidiary owns its separate net operating losses ("NOLs") and that tax refunds

generated by those NOLs, in turn, belong to the subsidiary.  However, the Treasury

Regulations associated with the 1986 Internal Revenue Code and pertaining to

consolidated tax groups do not contemplate the existence of "separate" NOLs for each

entity in a group.  In interpreting those regulations, the Supreme Court held that "the

Code and regulations governing affiliated groups of corporations filing consolidated

- 20 -

1  returns provide only one definition of NOL: 'consolidated' NOL." <u>United Dominion</u>

2  <u>Indus. v. United States</u>, 532 U.S. 822, 829 (2001).  According to the Court, "the concept

3  of separate NOL 'simply does not exist.'" <u>Id.</u> at 830.  As applied in the insolvency

4  context, this principle of tax law means that a subsidiary entity has <u>*no*</u> cognizable

5  property rights in its hypothetical separate NOLs.  <u>See, e.g.</u>, <u>Marvel Entm't Grp., Inc. v.</u>

6  <u>Mafco Holdings, Inc. (In re Marvel Entm't Grp., Inc.)</u>, 273 B.R. 58, 83-85 (D. Del. 2002)

7  (following <u>United Dominion Industries</u> in holding that subsidiary entity could not

8  maintain fraudulent transfer claims against its parent company because use of the

9  subsidiary entity's theoretical separate NOLs did not effect any transfer of its interests in

10  property).

11      <u>Finally</u>, and equally problematic, is that the <u>Bob Richards</u> line of cases appears to

12  turn on a posited rule of "federal common law," untethered to any statute, regulation, or

13  specific state law.  <u>See</u> <u>BSD Bancorp, Inc. v. FDIC (In re BSD Bancorp, Inc.)</u>, No. 93-

14  12207-A11, slip op. at 4 (S.D. Cal. Feb. 28, 1995) (describing the <u>Bob Richards</u> holding

15  as "apparently federal common law").[8]  The Supreme Court has subsequently strongly

16  cautioned against the creation of free-floating "federal common law" to fill gaps in

17  federal statutes, including the statutes governing the FDIC.  <u>See</u> <u>Atherton v. FDIC</u>, 519

18  U.S. 213 (1997); <u>O'Melveny & Myers v. FDIC</u>, 512 U.S. 79 (1994).  Following the

19  <u>Atherton</u> and <u>O'Melveny</u> decisions, the Ninth Circuit has recognized that it is necessary

20  for courts to reconsider prior principles of "federal common law" and avoid their

21  continued use absent a "unique federal interest."  <u>See</u> <u>Ledo Fin. Corp. v. Summers</u>, 122

22  F.3d 825, 828-29 (9th Cir. 1997).  As in <u>Atherton</u> and <u>O'Melveny</u>, there is no unique

23  federal interest that justifies the use of any "federal common law" here (as amply

24  demonstrated by the fact that Congress has not codified any such rule in the vast

25

26  ─────────────────

    [8] A copy of the <u>BSD</u> order, which has not been published and is not available on Westlaw or LEXIS, is

27  attached to the Saul Declaration as Exhibit 8.

28  <center>- 21 -</center>

1  expanses of title 12 and the Internal Revenue Code).  Thus, although it does not apply

2  here in any event due to the TSA's clear creation of a debtor-creditor relationship and

3  Bancorp's insolvency, the Court could appropriately determine that <u>Bob Richards</u> and

4  the handful of cases that finds that the tax refunds are held in trust posits a starting

5  assumption that has since been superseded by statute, regulation, and Supreme Court

6  decisions.

7       **D.    The tax allocation agreements that were at issue in the only two
            decisions ever finding in favor of the FDIC are materially different**

8            **from the TSA.**

9          The only two decisions ever to find a trust or agency relationship with respect to

10  tax refunds when the parties had entered into tax sharing agreements are inapplicable,

11  because those agreements are materially different from the TSA.  In the first case, the

12  court recognized that a parent corporation and its subsidiary may "expressly or

13  impliedly override the <u>Bob Richards</u> principal-agent relationship."  <u>BSD Bancorp</u>, slip

14  op. at 10.  The court found that the tax sharing agreement's use of the term "reimburse"

15  was insufficient alone to create a debtor-creditor relationship.  <u>Id.</u> at 10.  It then relied on

16  the agreement's express command that "except in the 'unusual' circumstances in which

17  the agreement allowed [the parent] to borrow the refund, the agreement required [the

18  parent] to give the [subsidiary bank] its share of the refund in cash and <u>*immediately*</u>" to

19  find a trust or agency relationship.  <u>Id.</u> at 11 (emphasis added).  In stark contrast, the

20  TSA, among other things, requires reimbursement or payment from fungible funds <u>*15*</u>

21  <u>*business days*</u> after Bancorp receives the refund and does not contain a separate

22  exception authorizing an "unusual" or "remote" loan treatment of the refunds in certain

23  circumstances.  <u>See</u> <u>NetBank</u>, slip op. at 26-28 (distinguishing BSD Bancorp on similar

24  grounds); <u>accord</u> <u>In re Coupon Clearing Serv.</u>, 113 F.3d at 1099-1102 (finding that

25  debtor had no trust or agent relationship where relevant contracts included no

26  segregation requirements or commingling mandates).

27

28                                          - 22 -

1    In the second case, the court also acknowledged that parties may allocate tax

2  refunds by agreement.  See Lubin v. FDIC, No. 1:10-CV-00874, 2011 WL 825751, at

3  *5 n.1 (N.D. Ga. Mar. 2, 2011).  Unlike the TSA, however, the tax sharing agreement in

4  Lubin expressly provided that the holding company "receives a tax refund . . . as agent

5  of the consolidated group on behalf of the individual group members" and that the

6  agreement "should not be intended to consider refunds attributable to the subsidiary

7  banks, which are received by the Holding Company from the taxing authority, as the

8  property of the Holding Company."  Id. at *5.  The TSA contains nothing even remotely

9  similar to the relevant provisions in the Lubin agreement, which the Lubin court

10  emphasized were critical to its conclusion.  Ultimately, Bancorp and the Bank _could_

11  _have_ included language in the TSA along the lines of the language so crucial to the

12  holdings in BSD Bancorp and Lubin, but they _did not_.  The language of the actual TSA

13  at issue here forms a debtor-creditor relationship.  Aware of the implications of this fact,

14  and in an effort to distract from the TSA itself, the Trustee expects the FDIC to summon

15  a blizzard of other purportedly contrary "authorities" and arguments.  As explained

16  below, none of the FDIC's theories alter the result clearly supported by NetBank, Team

17  Financial, First Central Financial, MCorp Financial, and Franklin Savings.

18    **E.    Statutes and regulations are silent as to ownership of tax refunds and
19            do not mandate a trust or agency relationship.**

20    The FDIC has commonly argued that, even in the absence of any language

21  establishing a trust relationship in a tax sharing agreement between the parent and

22  subsidiary, a variety of inapposite regulations and policy statements nonetheless create

23  such a relationship.  None of these regulations or policy statements, however, alter a

24  debtor-creditor relationship established under a tax sharing agreement.

25    **1.    Treasury Regulations are irrelevant to ownership of the Tax
            Refunds.**

26    The Treasury Regulations set forth in 26 C.F.R. § 1.1502-77 are merely

27  procedural and have no bearing on tax refund ownership.  The regulations state that "the

28

- 23 -

1  common parent . . . for a consolidated return year is the sole agent (agent for the group)

2  that is authorized to act in its own name with respect to all matters relating to the tax

3  liability for that consolidated return year, for . . . each member in the group." 26 C.F.R.

4  § 1.1502-77(a)(1)(i). The regulations also provide examples of the procedural matters

5  subject to such agency, including making certain elections, corresponding with the IRS,

6  and seeking extensions and petitions in tax court. 26 C.F.R. § 1.1502-77(a)(2)(i)-(xii).

7  Courts, including the Ninth Circuit in <u>Bob Richards</u>, have uniformly concluded that the

8  Treasury Regulations are "purely procedural in nature" and "do[] not affect the

9  entitlement as among the members of the [consolidated tax] Group to any refund paid by

10 the I.R.S." <u>First Cent. Fin.</u>, 269 B.R. at 489; <u>accord</u> <u>Bob Richards</u>, 473 F.2d at 265

11 (stating that Treasury Regulations are "basically procedural in purpose" and that the

12 "Internal Revenue Service is not concerned with the subsequent disposition of tax

13 refunds and none of its regulations can be construed to govern this issue"); <u>NetBank</u>,

14 slip op. at 13 ("[T]he designation of the Debtor as agent for the other members of the

15 Consolidated Group under 26 C.F.R. § 1.1502-77 does not create a relationship of

16 agent/trustee-principal/beneficiary between the Debtor and the Bank."); <u>Team Fin.</u>, 2010

17 WL 1730681, at *5-6 (stating that 26 C.F.R. § 1.1502-77(a) is procedural in nature and

18 irrelevant to ownership of tax refunds).

19          **2.      The Interagency Policy Statement is without force, inapt, and,
20                    in any event, ambiguous as to ownership of the Tax Refunds.**

21          The so-called "Interagency Policy Statement on Income Tax Allocation in a

22 Holding Company Structure" (the "Policy Statement")[9] is irrelevant to any resolution of

23

24 [9] The Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure states:

25          Regardless of the treatment of an institution's tax loss for regulatory reporting and
            supervisory purposes, a parent company that receives a tax refund from a taxing
26          authority obtains these funds as agent for the consolidated group on behalf of the group
            members. Accordingly, an organization's tax allocation agreement or other corporate
27          policies should not purport to characterize refunds attributable to a subsidiary depository
            institution that the parent receives from a taxing authority as the property of the parent.

28                                                                              *(cont'd)*

1  ownership of the Tax Refunds for several reasons.

2       First, the Policy Statement has no legal force.  The Policy Statement is a

3  statement of desired policy positions formulated by several banking regulators.  This

4  sort of document has no force or authority because it is neither rule nor regulation nor

5  law.  See, e.g., NetBank, slip op. at 29-30 (rejecting FDIC's reliance on the Policy

6  Statement in tax refund ownership dispute because it "does not constitute a rule or

7  regulation or have the force of law").  In a similar context, the Third Circuit rejected the

8  OTS's argument that certain directors and officers ran afoul of an OTS "Statement of

9  Policy" set forth at 12 C.F.R. § 571.7(b).  Seidman v. OTS (In re Seidman), 37 F.3d 911,

10  931-32 (3d Cir. 1994).  The court concluded that the policy statement was "just that—a

11  policy statement, not a regulation," and that it did not have the "force of law."  Id.  The

12  Policy Statement has even less force than the statement at issue in Seidman because it

13  has not even been published in the Code of Federal Regulations or subjected to public

14  process.  See, e.g., Krazalic v. Republic Title Co., 314 F.3d 875, 881 (7th Cir. 2002) ("A

15  simple announcement is too far removed from the process by which courts interpret

16  statutes to earn deference.  A simple announcement is all we have here.  One fine day

17  the policy statement simply appeared in the Federal Register.  No public process

18  preceded it . . . ."); Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n,

19  869 F.2d 719, 736 (3d Cir. 1989) (concluding that a governmental agency's policy

20  statement "is entitled to no greater deference than any other policy statement, i.e.,

21  none").

22       Second, even if the Policy Statement had some legal force (which it does not), it

23  is inapplicable here because the safety and soundness concerns underlying the Policy

24  Statement are irrelevant after a bank's failure.  The Policy Statement "reiterates and

25  clarifies the position the Agencies will take as they carry out their supervisory

26

27  63 Fed. Reg. 64,757, 64,759 (Nov. 23, 1998) (footnote omitted).  A copy of the Policy Statement is
attached as Exhibit 7.  Saul Decl. ¶ 18, Ex. 7.

28

- 25 -

1  responsibilities" of regulated institutions and states that any practice "not consistent with

2  this policy statement may be viewed as an unsafe and unsound practice."  63 Fed. Reg.

3  at 64,757, 64,758 (emphasis added).  Nothing in the Policy Statement purports to render

4  contracts relating to tax refund allocations void *ab initio*.  The FDIC's and OTS's

5  regulatory roles with respect to the Bank have ceased, and nothing in the Policy

6  Statement suggests that a tax sharing agreement that may have presented safety and

7  soundness concerns while the Bank was operational has altered effect in determining the

8  separate issue of ownership of tax refunds after the Bank fails.  Simply put, the Policy

9  Statement does not bear on the legal effects of the actual agreement between the parties.

10      <u>Finally</u>, the Policy Statement, which expressly encourages parents and

11  subsidiaries to enter into tax allocation agreements, is ambiguous at best regarding its

12  application under these circumstances.  One passage in the Policy Statement states that a

13  parent company receives refunds "as agent for the consolidated group on behalf of the

14  group members," but cites exclusively to Treasury Regulation § 1.1502-77(a).  <u>Id.</u> at

15  64,759 n.3.  This regulation, as discussed, merely characterizes the parent corporation as

16  agent solely for procedural purposes and does not affect ownership of tax refunds.  <u>See,</u>

17  <u>e.g.</u>, <u>Team Fin.</u>, 2010 WL 1730681, at *9.

18      Likewise, the aspirational statement that "an organization's tax allocation

19  agreement or other corporate policies <u>*should not*</u> purport to characterize refunds

20  attributable to a subsidiary depository institution that the parent receives from a taxing

21  authority as the property of the parent," 63 Fed. Reg. at 64,758 (emphasis added), is also

22  unclear and may simply mean that a parent should not keep all of a group's refunds free

23  and clear without a corresponding reimbursement to the subsidiary.  As discussed, the

24  TSA requires Bancorp to reimburse the Bank; therefore, it is consistent with the latter

25  reasonable interpretation of the TSA.  In any event, the "*should* not" language is merely

26  regulatory suggestion (at best), and does not even purport to create any sort of mandate

27  or obligation (in contrast to "shall not," "must not," or similar language).

28

- 26 -

1    Another portion of the Policy Statement creates further ambiguity by

2 characterizing the subsidiary's entitlement to a "refund from its parent in an amount no

3 less than the amount the institution would have been entitled to receive as a separate

4 entity" as a _receivable_, which suggests that even the Policy Statement recognizes the

5 possibility of a debtor-creditor relationship.  Id.

6    Even though the agencies could have taken a clear policy position in the Policy

7 Statement (or in a formal regulation or rule) that the debtor-creditor relationships upheld

8 by the courts in the Franklin Savings and MCorp decisions, both of which were

9 published before the Policy Statement, presented a safety and soundness concern, they

10 did not.  This silence in the face of known law is telling.   See Wyeth v. Levine, 129 S.

11 Ct. 1187, 1200 (2009) (concluding that Congress's silence on whether federal law

12 preempted state law, "coupled with its certain awareness of the prevalence of state tort

13 litigation, is powerful evidence that Congress did not intend" federal preemption).

14   **F.    The FDIC's purported repudiation is irrelevant to ownership of the Tax
             Refunds.**

15

16    Based on the FDIC's Proof of Claim and its approach to tax allocation

17 agreements and refunds in other bankruptcy proceedings, it appears the FDIC believes

18 that its attempted repudiation voids the TSA and that the gap-filling rule in Bob

19 Richards now determines ownership of the Tax Refunds.  However, because the Tax

20 Refunds became property of the estate on the Petition Date, the FDIC's attempt to

21 obtain the Tax Refunds by repudiation was an obvious violation of the automatic stay,

22 which is void and of no effect.  Even if the repudiation were valid, it does not nullify the

23 TSA and the TSA still governs ownership of the Tax Refunds.

24      **1.    The FDIC's purported repudiation violated the automatic stay.**

25    Bankruptcy Code section 362(a)(3) prohibits "any act to obtain possession of

26 property of the estate or of property from the estate or to exercise control over property

27 of the estate," 11 U.S.C. § 362(a)(3), including actions by the FDIC as receiver.  See,

28

- 27 -

1    e.g., In re Colonial Realty Co., 980 F.2d 125, 137 (2d Cir. 1992).  Violations of the

2    automatic stay are void *ab initio* and of no effect.  Schwartz v. United States (In re

3    Schwartz), 954 F.2d 569, 571 (9th Cir. 1992) ("violations are void without the need for

4    direct challenge").  A party's potential ability to terminate or otherwise end a contract

5    with a debtor does not obviate the need for that party to obtain relief from the automatic

6    stay before doing so.  See Computer Commc'ns, Inc. v. Codex Corp. (In re Computer

7    Commc'ns, Inc.), 824 F.2d 725, 730 (9th Cir. 1987).

8        Under clearly established law, all of Bancorp's tax attributes and rights with

9    respect to accrued and future refunds became property of the estate on the Petition Date.

10   For example, in Segal v. Rochelle, the Supreme Court held that potential claims for tax

11   refunds arising from carrying back losses in the year of bankruptcy to previous years

12   became property of the bankruptcy estate upon filing of the petition.  382 U.S. 375, 379-

13   80 (1966).  The "two key elements" supporting the Court's holding are also present here:

14   as of the Petition Date, (i) Bancorp paid taxes within the carryback period and (ii) the

15   "year of bankruptcy at that point exhibited a net operating loss."  Id. at 380; see also,

16   e.g., United States v. Sims (In re Feiler), 218 F.3d 948, 956 (9th Cir. 2000) (holding that

17   tax attributes creating a *potential* right to tax refunds are property of debtor's bankruptcy

18   estate); United States v. Carey (In re Wade Cook Fin. Corp.), 375 B.R. 580, 594-97

19   (B.A.P. 9th Cir. 2007) (detailing why estate obtained property rights in future tax

20   refunds based upon losses incurred prior to the petition date).

21       Thus, the FDIC's attempt to assert control of Bancorp's tax attributes and/or of

22   any accrued or anticipated refunds that result from pre-petition CNOLs by (i) a

23   purported, post-hoc repudiation of the TSA and (ii) filing of separate tax returns in an

24   attempt to obtain the refunds directly from the IRS, violated the automatic stay and was

25   void and ineffectual under Bankruptcy Code section 362(a)(3).  See, e.g., NetBank, slip

26   op. at 32-33 (discussing why FDIC's attempted repudiation of tax sharing agreement

27   and filing of competing returns violated the stay); Parker v. Saunders (In re Bakersfield

28

1   <u>Westar, Inc.)</u>, 226 B.R. 227 (B.A.P. 9th Cir. 1998) (invalidating attempted exercise of

2   control over debtor's tax attributes as violation of the automatic stay).

3          The FDIC's purported repudiation also violated Bankruptcy Code section

4   362(a)(6), which prohibits "any act to collect, assess, or recover a claim against the

5   debtor that arose before the commencement of the case under this title."  11 U.S.C.

6   § 362(a)(6).  The FDIC's contractual right under the TSA arose before the Petition Date.

7   The FDIC's purported repudiation of the TSA and attempt to obtain payment of the Tax

8   Refunds directly from the IRS is "an effort to collect or recover a claim against the

9   Debtor by end-running the bankruptcy claims process" that violates section 362(a)(6).

10  <u>NetBank</u>, slip op. at 33.  The FDIC has, at most, an unsecured prepetition claim for any

11  amounts to which it may be contractually due under the TSA; it must seek payment as

12  an unsecured general claimant of the estate.

13          **2.      The TSA governs this dispute even if repudiation was effective.**

14          Even if the FDIC's repudiation is valid (which it is not), it does not entitle the

15  FDIC to recover the Tax Refunds under the theory of unjust enrichment that underlies

16  <u>Bob Richards</u>.  Repudiation does not vaporize, nullify, or completely undo a contractual

17  relationship between contracting parties.  Rather, repudiation, just like rejection of an

18  executory contrary, "is treated as a breach of contract giving rise to an ordinary contract

19  claim for damages."  <u>ALLTEL Info. Servs., Inc. v. FDIC</u>, 194 F.3d 1036, 1039 (9th Cir.

20  1999); <u>accord</u> <u>Howell v. FDIC</u>, 986 F.2d 569, 571 (1st Cir. 1993); <u>RTC v. Mgmt., Inc.</u>,

21  25 F.3d 627, 631 (8th Cir. 1994).  The underlying contract that defines the parties'

22  debtor-creditor relationship—the TSA—still exists and governs.

23          Because "repudiation" is a limited event, the case law makes clear that equitable

24  remedies, such as unjust enrichment, are unavailable to parties to a repudiated contract.

25  For example, in <u>WRH Mortgage, Inc. v. S.A.S. Associates.</u>, 214 F.3d 528 (4th Cir.

26  2000), the Fourth Circuit rejected the argument that the RTC's repudiation, as receiver,

27

28

- 29 -

of a lease permitted recovery under an equitable remedy such as unjust enrichment.  In

reaching this conclusion, the court explained:

> Where a contract governs the relationship of the parties, the equitable remedy of restitution grounded in quasi-contract or unjust enrichment does not lie.  The Agreement clearly governs the relationship of the parties to it despite the breach occasioned by RTC's repudiation of the lease portion of the Agreement.  Therefore it cannot be said that there is "no longer" a contract between the parties.  A valid contract does exist. We deal here with the consequences of its breach.

WRH Mortg., 214 F.3d at 532-34.  Thus, post-repudiation, the operative

agreement remains extant; the parties do not revert to a world without a contract.

Here, the FDIC's purported repudiation does not entitle it to recover the tax

refunds under the theory of unjust enrichment—the same theory underlying the Bob

Richards decision.  Rather, the FDIC's sole remedy is to assert a general unsecured

claim to the amount it believes it is due under the TSA.

### G.    The Tax Refunds are property of the estate even though the TSA was deemed rejected.

Pursuant to the Bankruptcy Code, a trustee "may assume or reject any executory

contract."  11 U.S.C. § 365(a).  If a chapter 7 trustee does not assume or reject a contract

within 60 days of the order for relief, "then such contract . . . is deemed rejected."  Id.

§ 365(d)(1).  Just as when a contract is repudiated by the FDIC, rejection in bankruptcy

"is not the equivalent of rescission."  In re Onecast Media, Inc., 439 F.3d 558, 563 (9th

Cir. 2006) (citation and internal quotation marks omitted); see also, e.g., Thompkins v.

Lil' Joe Records, Inc., 476 F.3d 1294, 1306 (11th Cir. 2007) ("[R]ejection 'does not

embody the contract-vaporizing properties so commonly ascribed to it . . . .  Rejection

merely frees the estate from the obligation to perform; it does not make the contract

disappear.'" (citation omitted)).  Rather, rejection "relieves the debtor of burdensome

future obligations while he is trying to recover financially and it constitutes a breach of a

1 | contract which permits the other party to file a creditor's claim."  Top Rank, Inc. v.

2 | Ortiz (In re Ortiz), 400 B.R. 755, 764 (C.D. Cal. 2009).

3 |       That the Trustee did not assume the TSA does not affect the estate's property

4 | interest in the Tax Refunds.[10]  First, as with repudiation, rejection does not change the

5 | underlying relationship of the parties or the determination of whether Bancorp would

6 | hold the refunds in trust or whether the Bank merely has a claim to reimbursement

7 | (subject to the terms set forth in the TSA).  See Thompkins, 476 F.3d at 1306 (holding

8 | that rejection freed the debtor of the duty to pay royalties but does not undermine his

9 | ownership of copyrights).  Second, even if rejection did change the relationship of the

10 | parties, it would not be relevant for tax attributes and refunds that were already vested in

11 | the estate on the Petition Date.  See NetBank, slip op. at 36 (concluding that tax refund

12 | "constitutes property of the Debtor's estate whether or not the Tax Sharing Agreement

13 | was rejected pursuant to the Plan."); In re Exec. Tech. Data Sys., 79 B.R. 276, 282

14 | (Bankr. E.D. Mich. 1987) ("Property acquired prior to the filing of a petition in

15 | bankruptcy remains property of the estate regardless of whether the trustee or debtor in

16 | possession assumes or rejects the unperformed obligations of the contract pursuant to

17 | which the property was acquired.").  Instead, the legal effect of any deemed rejection

18 | would merely be to treat the TSA as a breached contract and then convert any claims

19 | that the FDIC has under that agreement (regardless of when they arose) to prepetition

20 | unsecured claims.  See 11 U.S.C. §§ 365(g)(1) & 502(g)(1); see also, e.g., Taunton Mun.

21 | Lighting Plant v. Enron Corp. (In re Enron Corp.), 354 B.R. 652 (S.D.N.Y. 2006)

22 | (demonstrating operation of these provisions).  For the reasons set forth above, the Tax

23 | Refunds were legally vested in the Bancorp estate as of the Petition Date, so Bancorp

24 |

25 | _____
[10] To resolve this Motion, the Court need not determine whether the TSA was an executory contract

26 | subject to assumption with respect to the allocation of any tax refunds based on pre-bankruptcy losses and tax liabilities.  Accordingly, the Trustee takes no position as to whether the TSA was assumable

27 | under 11 U.S.C. § 365.

28 |

PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT

1 would still have ownership of those funds even if the TSA had no prospective effect

2 after bankruptcy.

3 **V.    <u>CONCLUSION</u>**

4        The First Amended Complaint presents issues that can be resolved by reference

5 to facts that are beyond dispute.  The Court should grant summary judgment for the full

6 amount of the Tax Refunds, as specified above.  In the event that the Court does not

7 fully adjudicate this adversary proceeding by this motion, the Court should, in the

8 alternative, enter an order pursuant to Fed. R. Civ. P. 56(g) establishing the facts that are

9 not genuinely at issue, as set forth above.

10

11 Dated:  April 19, 2011          KLEE, TUCHIN, BOGDANOFF & STERN LLP

12                                By:_____

13                                Lee R. Bogdanoff (State Bar No. 119542)

14                                David M. Stern (State Bar No. 67697)
                                 Matthew C. Heyn (State Bar No. 227474)

15
                                 General Bankruptcy Counsel for Plaintiff and Chapter 7
16                                Trustee Alfred H. Siegel

17                                BUCKLEYSANDLER LLP

18                                Andrew L. Sandler *(Admitted Pro Hac Vice)*
                                 Benjamin B. Klubes *(Admitted Pro Hac Vice)*
19                                Benjamin P. Saul (Admitted *Pro Hac Vice)*

20
                                 Special Counsel for Plaintiff and Chapter 7 Trustee
21                                Alfred H. Siegel

22

23

24

25

26

27

28
                                       - 32 -